# MARK D. NIELSEN ET AL. *v.* STATE OF CONNECTICUT ET AL.
## (15217)

Peters, C. J., and Callahan, Borden, Berdon, Norcott, Katz and Palmer, Js.

Argued November 28, 1995—decision released February 6, 1996

*Wesley W. Horton* and *Mark D. Nielsen,* with whom were *Melicent B. Thompson,* legal intern, and, on the brief, *Mario Thomas Gaboury, Douglas Foster,* pro hac vice, *Martin S. Kaufman,* pro hac vice, and *John K. Bush,* pro hac vice, for the appellants (plaintiffs).

*Gregory T. D'Auria,* assistant attorney general, with whom were *Henry S. Cohn,* assistant attorney general, and, on the brief, *Richard Blumenthal,* attorney general, for the appellees (defendants).

*Robert A. Heghmann* filed a brief for The Federation of Connecticut Taxpayer Organizations as amicus curiae.

PETERS, C. J. The dispositive issue in this appeal is the justiciability of a claim that the General Assembly has wrongfully failed to enact statutory definitions that article third, § 18, of the constitution of Connecticut[1]

---

[1] The constitution of Connecticut, article third, § 18, as adopted in article twenty-eight of the amendments, provides: "(a) The amount of general budget expenditures authorized for any fiscal year shall not exceed the estimated amount of revenue for such fiscal year.

"(b) The general assembly shall not authorize an increase in general budget expenditures for any fiscal year above the amount of general budget expenditures authorized for the previous fiscal year by a percentage which exceeds the greater of the percentage increase in personal income or the percentage increase in inflation, unless the governor declares an emergency or the existence of extraordinary circumstances and at least three-fifths of the members of each house of the general assembly vote to exceed such limit for the purposes of such emergency or extraordinary circumstances. The general assembly shall by law define 'increase in personal income', 'increase in inflation' and 'general budget expenditures' for the purposes of this section and may amend such definitions, from time to time, provided general budget expenditures shall not include expenditures for the payment of bonds, notes or other evidences of indebtedness. The enactment or amendment of such definitions shall require the vote of three-fifths of the members of each house of the general assembly.

"(c) Any unappropriated surplus shall be used to fund a budget reserve fund or for the reduction of bonded indebtedness; or for any other purpose

expressly requires for the implementation of that constitutional amendment. The plaintiffs, who are citizens and taxpayers of the state,[2] brought suit against the General Assembly and various state officials[3] to compel the General Assembly to enact legislation that would implement the constitutional spending cap contemplated by the adoption of article third, § 18. The trial court, concluding that the claim presented by the plaintiffs is nonjusticiable, dismissed the plaintiffs' amended complaint for lack of subject matter jurisdiction. The plaintiffs appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c). We affirm the judgment of the trial court.

The history of article third, § 18, begins with the General Assembly's adoption of House Joint Resolution No. 205[4] on August 21, 1991. Public and Special Acts, 1991,

authorized by at least three-fifths of the members of each house of the general assembly."

[2] The plaintiffs are Mark Nielsen, Mary McCarthy, Joseph Bukowski, Andrew Goddard, Robert King, Linda Kovacs, Frederick Thomas, Tyrone Humes, Ronald Plummer, John Holbrook, Christopher Calandra and Citizens for a Sound Economy Foundation.

[3] The plaintiffs named as defendants in their amended complaint the General Assembly and its two constituent houses, the speaker of the House of Representatives, the president pro tempore of the Senate, the comptroller of the state of Connecticut and the treasurer of the state of Connecticut.

[4] "House Joint Resolution No. 205

"RESOLUTION PROPOSING A CONSTITUTIONAL AMENDMENT IMPOSING A LIMIT ON STATE EXPENDITURES.

"Resolved by this Assembly:

"That the following be proposed as an amendment to the constitution of the state, which, when approved and adopted in the manner provided by the constitution, shall, to all intents and purposes, become a part thereof:

"Article third of the constitution is amended by adding section 18 as follows:

"Sec. 18. (a) The amount of general budget expenditures authorized for any fiscal year shall not exceed the estimated amount of revenue for such fiscal year.

"(b) The general assembly shall not authorize an increase in general budget expenditures for any fiscal year above the amount of general budget expenditures authorized for the previous fiscal year by a percentage which

vol. 4, part 3. The resolution proposed an amendment of article third to enact a spending cap provision that, in the absence of an emergency or extraordinary circumstances, would prohibit the General Assembly from authorizing an increase in general budget expenditures that exceeds the percentage increase in personal income or inflation, whichever is higher. On November 3, 1992, the proposed amendment was duly presented to the electorate for its approval at the general election. On November 25, 1992, the secretary of the state certified that a majority of the voters had approved the amendment, which was designated amendment twenty-eight to the constitution and was subsequently denominated article third, § 18.

Article third, § 18, as approved by the voters, expressly requires the General Assembly to define

exceeds the greater of the percentage increase in personal income or the percentage increase in inflation, unless the governor declares an emergency or the existence of extraordinary circumstances and at least three-fifths of the members of each house of the general assembly vote to exceed such limit for the purposes of such emergency or extraordinary circumstances. The general assembly shall by law define 'increase in personal income', 'increase in inflation' and 'general budget expenditures' for the purposes of this section and may amend such definitions, from time to time, provided general budget expenditures shall not include expenditures for the payment of bonds, notes or other evidences of indebtedness. The enactment or amendment of such definitions shall require the vote of three-fifths of the members of each house of the general assembly.

"(c) Any unappropriated surplus shall be used to fund a budget reserve fund or for the reduction of bonded indebtedness; or for any other purpose authorized by at least three-fifths of the members of each house of the general assembly.

"RESOLVED: That the foregoing proposed amendment to the constitution be continued to the next session of the general assembly elected at the general election to be held on November 3, 1992, and published with the laws passed at the present session, or be presented to the electors at the general election to be held on November 3, 1992, whichever the case may be, according to article sixth of the amendments to the constitution. The designation of said proposed amendment to be used on the voting machine ballot labels and absentee ballots at such election shall be 'Shall the constitution of the state be amended to impose a limit on state expenditures?' "

"increase in personal income," "increase in inflation" and "general budget expenditures" (hereinafter the spending cap terms) in order to implement the spending cap. Conn. Const., art. III, § 18 (b). The amendment also expressly provides that these essential definitions may be enacted or amended only by a three-fifths vote in both the Senate and the House of Representatives. Conn. Const., art. III, § 18 (b). To date, the General Assembly has not defined the spending cap terms by the required vote.[5]

The plaintiffs brought suit to compel the General Assembly to define the spending cap terms. The plaintiffs' amended complaint alleged that the General Assembly has "failed and refused" to define these terms since the electorate approved article third, § 18, at the 1992 general election. The plaintiffs' prayer for declaratory and injunctive relief sought a judgment that: (1) the General Assembly must define the spending cap terms before it may enact or adopt a budget, interim appropriation tax or other fiscal measure that levies or expends tax revenue; (2) the state and the General Assembly may not allocate and spend funds for general budget expenditures greater than the funds expended for such expenditures in fiscal year 1992–1993 unless and until the General Assembly defines the spending cap terms; and (3) the state treasurer and the state comptroller may not disburse funds for general budget expenditures greater than the funds authorized for such expenditures in fiscal year 1992–1993 unless and until the General Assembly defines the spending cap terms.

The defendants moved to dismiss the plaintiffs' amended complaint on a number of grounds. They claimed that the trial court lacked subject matter juris-

---

[5] The General Assembly has defined, by a simple majority vote, "increase in personal income," "increase in inflation" and "general budget expenditures" for purposes of a statutory spending cap. See General Statutes § 2-33a.

diction to determine the merits of the case because of sovereign immunity, legislative immunity, mootness and nonjusticiability. The trial court granted the defendants' motion to dismiss on the basis of nonjusticiability. The trial court held that the language of article third, § 18, evinced a clear textual commitment of exclusive authority to the General Assembly to define the spending cap terms. In light of that textual commitment, the trial court concluded that the dispute presented a political question that could not be adjudicated by judicial authority. Additionally, the trial court concluded that it could not provide the relief sought by the plaintiffs without violating constitutional principles of separation of powers.

In this appeal, the plaintiffs claim that the trial court improperly concluded that the dispute is nonjusticiable. Although the plaintiffs concede that article third, § 18, expressly authorizes the General Assembly to define the spending cap terms, they argue that the power to define these terms is not textually committed to the General Assembly. They further argue that a court can provide them with an appropriate remedy either in the ways articulated in their prayer for relief or, if the General Assembly nevertheless fails to define the spending cap terms, by having the court itself define these terms. We disagree with both of the plaintiffs' arguments.[6]

The principles that underlie justiciability are well established. "Justiciability requires (1) that there be an actual controversy between or among the parties to the dispute . . . (2) that the interests of the parties be adverse . . . (3) that the matter in controversy be capable of being adjudicated by judicial power . . . and (4) that the determination of the controversy will

---

[6] The defendants reassert the defense of legislative immunity that they had raised before the trial court. Because we hold that the dispute is nonjusticiable, we need not address this claim.

result in practical relief to the complainant." (Citations omitted.) *State* v. *Nardini*, 187 Conn. 109, 111–12, 445 A.2d 304 (1982); *Pellegrino* v. *O'Neill*, 193 Conn. 670, 674, 480 A.2d 476, cert. denied, 469 U.S. 875, 105 S. Ct. 236, 83 L. Ed. 2d 176 (1984). The third requirement for justiciability, the political question doctrine, is based on the principle of separation of powers. *Nielsen* v. *Kezer*, 232 Conn. 65, 75, 652 A.2d 1013 (1995); *Pellegrino* v. *O'Neill*, supra, 680. "The characterization of [an issue] as political is a convenient shorthand for declaring that some other branch of government has constitutional authority over the subject matter superior to that of the courts." *Pellegrino* v. *O'Neill*, supra, 680. "The fundamental characteristic of a political question, therefore, is that its adjudication would place the court in conflict with a coequal branch of government in violation of the primary authority of that coordinate branch. *Baker* v. *Carr*, [369 U.S. 186, 217, 82 S. Ct. 691, 7 L. Ed. 2d 663 (1962)]." *Nielsen* v. *Kezer*, supra, 74.

"Whether a controversy so directly implicates the primary authority of the legislative or executive branch, such that a court is not the proper forum for its resolution, is a determination that must be made on a case-by-case inquiry." Id., 74–75. "Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question. Unless one of

these formulations is inextricable from the case at bar, there should be no dismissal for nonjusticiability on the ground of a political question's presence." *Baker* v. *Carr*, supra, 369 U.S. 217; see *Fonfara* v. *Reapportionment Commission*, 222 Conn. 166, 184–85, 610 A.2d 153 (1992).

In *Pellegrino* v. *O'Neill*, supra, 193 Conn. 670, we held nonjusticiable a claim that inadequate financing of the state's judicial system had produced a backlog of civil jury cases in violation of the plaintiffs' constitutional right to the administration of justice without delay. See Conn. Const., art. I, § 10. We based our holding on the failure of the plaintiffs' claim to satisfy the third and fourth requirements for justiciability. We first determined that the plaintiffs sought to increase the number of state judges. *Pellegrino* v. *O'Neill*, supra, 678. We then determined that the appointment of additional judges was textually committed to the General Assembly by article fifth, § 2.[7] Id., 681. We further determined that the judiciary could not provide the relief sought by the plaintiffs without violating separation of powers. Id., 681–84. In light of the clear textual commitment relegating the size of the judiciary to a coordinate branch of government and the inability of our courts to provide a remedy, we concluded that the dispute was nonjusticiable.

The considerations that led us to conclude that the dispute at issue in *Pellegrino* was nonjusticiable compel the same conclusion in this case. "Although it is widely assumed that the judiciary, as ultimate arbiter of the

---

[7] At the time of *Pellegrino* v. *O'Neill*, supra, 193 Conn. 670, the constitution of Connecticut, article fifth, § 2, as amended by article twenty of the amendments, provided in relevant part: "The judges of the . . . superior court shall, upon nomination by the governor, be appointed by the general assembly in such manner as shall by law be prescribed. . . ."

In 1986, the constitution of Connecticut, article fifth, § 2, was amended by article twenty-five of the amendments.

meaning of constitutional provisions, must determine every constitutional claim presented and provide appropriate relief, some constitutional commands fall outside the conditions and purposes that circumscribe judicial action." Id., 679. The plaintiffs have raised a claim that inextricably presents a political question not amenable to judicial resolution and that seeks relief that a court cannot provide without an impermissible intrusion upon the prerogatives and functions of the coordinate branches of government. For both these reasons, we conclude that this case is nonjusticiable.

Central to our determination that the plaintiffs' claim presents a nonjusticiable political question is the "textually demonstrable constitutional commitment" of the definition of the spending cap terms to the General Assembly. See id., 681. Article third, § 18 (b), provides in relevant part: "The *general assembly shall by law define* 'increase in personal income', 'increase in inflation' and 'general budget expenditures' for the purposes of this section . . . ." (Emphasis added.) This provision, by its plain and unambiguous terms, commits exclusively to the General Assembly the power to define the spending cap terms and nowhere intimates any role in this process for the judiciary. Moreover, neither the structure nor the history of the provision manifests any intended constraint on the unconditional definitional authority conferred upon the General Assembly. See, e.g., *Nixon* v. *United States*, 506 U.S. 224, 229–33, 113 S. Ct. 732, 122 L. Ed. 2d 1 (1993). Nothing elsewhere in our constitution contradicts this textual commitment to the General Assembly.

As we observed in *Pellegrino* v. *O'Neill*, supra, 193 Conn. 683, a specific textual commitment distinguishes cases that are nonjusticiable from cases such as *Horton* v. *Meskill*, 172 Conn. 615, 376 A.2d 359 (1977) (*Horton I*). The constitutional provision at issue in *Horton I* was article eighth, § 1, which provides: "There shall always

be free public elementary and secondary schools in the state. The general assembly shall implement this principle by appropriate legislation." In construing that provision, we expressly held that the then-existing financing scheme for the state's public schools "[was] not 'appropriate legislation' (article eighth, § 1) to implement the requirement that the state provide a substantially equal educational opportunity to its youth in its free public elementary and secondary schools." *Horton I*, supra, 649. We reaffirmed our authority to direct legislative reform of school financing statutes in *Horton* v. *Meskill*, 195 Conn. 24, 35–38, 486 A.2d 1099 (1985) (*Horton III*). It was in light of the textual distinction between these different constitutional provisions that, in *Pellegrino* v. *O'Neill*, supra, 683, we described *Horton I* as "clearly [a case] where a judicial remedy could have been applied . . . ."

Accordingly, because article third, § 18, clearly commits to the General Assembly the sole authority to define the spending cap terms, we have no jurisdiction to consider the merits of the plaintiffs' claim. "We must resist the temptation which this case affords to enhance our own constitutional authority by trespassing upon an area clearly reserved as the prerogative of a coordinate branch of government." *Pellegrino* v. *O'Neill*, supra, 193 Conn. 681.

In addition to its emphasis on dispositive textual language, *Pellegrino* also focused on whether the claim before the court was one for which the judiciary could provide the relief sought by the plaintiffs without violating separation of powers. Id., 681–84; see also *State* v. *Nardini*, supra, 187 Conn. 112. In this case, each of the alternate forms of relief that the plaintiffs seek— mandating the General Assembly to define the spending cap terms by the necessary three-fifths vote in each house, enjoining state officials from spending funds in excess of the funds spent in fiscal year 1992–1993 until

the General Assembly defines the terms or defining the terms ourselves—raises separation of powers concerns that counsel strongly against justiciability.

Our decision in *Pellegrino* illuminates why we cannot compel the General Assembly to define the spending cap terms. "It is well established that a court cannot mandate performance of a constitutional duty by a legislature, particularly where that duty involves the exercise of discretion necessary to the enactment of legislation . . . . [I]n all human contrivances confidence must be reposed somewhere, and . . . under the distribution of powers . . . in our State, it is not given to the judiciary to *compel* action on the part of a coordinate branch of the government. . . . That the votes of individual legislators should be subject to direct control by judicial decree . . . is a proposition we cannot accept." (Citations omitted; emphasis in original; internal quotation marks omitted.) *Pellegrino* v. *O'Neill*, supra, 193 Conn. 682.

For similar reasons, we cannot enjoin state officials from spending funds in excess of the funds spent before the adoption of article third, § 18. A necessary predicate for a right to injunctive relief is the determination that a constitutional right exists and has been violated. For example, in *Horton I*, supra, 172 Conn. 651–53, a judicial remedy could be fashioned to enjoin state officials from violating the plaintiffs' constitutional right to a substantially equal educational opportunity. See also *Pellegrino* v. *O'Neill*, supra, 193 Conn. 683. In this case, however, the adoption of article third, § 18, establishes only a future right to a spending cap, a right that will mature into an actionable right only *after* its predicate terms have been defined by the General Assembly. See *State* v. *Sanabria*, 192 Conn. 671, 687–91, 474 A.2d 760 (1984) (amendment to article first, § 8, that provided certain criminal defendants right to probable cause hearing "in accordance with procedures prescribed by law" not

effective until General Assembly had enacted implementing legislation); see also *State ex rel. Cotter* v. *Leipner*, 138 Conn. 153, 158, 161–62, 83 A.2d 169 (1951). In the absence of defined terms, there is no basis for enjoining presently permissible conduct by a coordinate branch of government.

Finally, we decline the plaintiffs' request that we ourselves should undertake to supply the definitions that the General Assembly has failed to enact and give immediate operative effect to article third, § 18. We decline to do so for two reasons. First, we can discern no principled guidelines for the definitions contemplated by article third, § 18. Second, we are persuaded that our intervention would directly contravene the amendment as it was adopted.

The terms for which article third, § 18, requires definitions have no inherent meanings that are reliably discernable through judicial processes. The decision of what is to be encompassed within "increase in personal income," "increase in inflation" and "general budget expenditures" requires the exercise of political judgment rather than the application of judicial scrutiny. Nothing in our constitutional law provides reliable guidance for judicial discernment of the appropriate legal definitions or standards to attach to these spending cap terms. The "lack of judicially discoverable and manageable standards for resolving" the claim before the court is a hallmark of nonjusticiability. *Baker* v. *Carr*, supra, 369 U.S. 217.

More fundamentally, article third, § 18, assigns sole responsibility to the General Assembly, and not to the judiciary, to define the terms that will make the spending cap operative. In adopting the amendment, the voters must have contemplated that the political process of consensus and compromise would be brought to bear in determining how quickly, and how broadly, the

spending cap would limit future budgetary decisions. We have no authority to excise from the text of article third, § 18, the political decision-making process that is integral to the amendment's mandate and that we must assume to have been significant to its adoption.[8] See *Pellegrino* v. *O'Neill*, supra, 193 Conn. 679; see also *Stolberg* v. *Caldwell*, 175 Conn. 586, 595, 402 A.2d 763 (1978), appeal dismissed sub nom. *Stolberg* v. *Davidson*, 454 U.S. 958, 102 S. Ct. 496, 70 L. Ed. 2d 374 (1981); *Adams* v. *Rubinow*, 157 Conn. 150, 153–54, 251 A.2d 49 (1968). Although the judiciary may review the conduct of a coordinate branch of government in order to determine whether that conduct conforms to constitutional dictates; see, e.g., *Horton I*, supra, 172 Conn. 649; the sound jurisprudential principles that underlie the separation of powers preclude our exercise of authority that has been conferred expressly and exclusively upon a coordinate branch of government.

Our decision requires the plaintiffs to seek relief elsewhere. The voters who cast their ballots to adopt article third, § 18, entrusted its implementation to their legislators. If the plaintiffs and other voters are dissatisfied with that implementation, their recourse is to the political process.

The judgment is affirmed.

In this opinion CALLAHAN, BORDEN, NORCOTT, KATZ and PALMER, Js., concurred.

BERDON, J., concurring. I am unable to distinguish this case from *Horton* v. *Meskill*, 172 Conn. 615, 376 A.2d 359 (1977). In both cases the constitution directs the legislature to act in order to implement the respec-

---

[8] For this reason, we cannot substitute for the future end product of that political process the statutory spending cap in General Statutes § 2-33a, because it was not enacted by the constitutionally required three-fifths vote in each house of the General Assembly.

tive constitutional provisions.[1] Yet, in *Horton*, the court saw no impediment to its jurisdiction even though the constitutional provision providing for free public education was required to be implemented by the legislature. Likewise, there should be no impediment to this court's jurisdiction with respect to article third, § 18, as adopted by article twenty-eight of the amendments to the state constitution. The only distinction that can be made between *Horton* and this case is that in *Horton* the legislature acted, but its action was constitutionally deficient, while in the present case, the General Assembly has, as of this day, failed to define the operative terms of the constitutional provision. From this distinction, the majority concludes that when the General Assembly acts we have jurisdiction and no political question exists, but when the General Assembly fails to act in accordance with its constitutional mandate, a political question exists and we are without jurisdiction. This is simply a distinction without a difference.

It appears that the majority holds that this court will never have jurisdiction unless the legislature defines the

---

[1] The constitution of Connecticut, article eighth, § 1, provides: "There shall always be free public elementary and secondary schools in the state. The *general assembly shall implement* this principle by appropriate legislation." (Emphasis added.)

The constitution of Connecticut, article third, § 18, as adopted by article twenty-eight of the amendments, provides in relevant part: "(a) The amount of general budget expenditures authorized for any fiscal year shall not exceed the estimated amount of revenue for such fiscal year.

"(b) The general assembly shall not authorize an increase in general budget expenditures for any fiscal year above the amount of general budget expenditures authorized for the previous fiscal year by a percentage which exceeds the greater of the percentage increase in personal income or the percentage increase in inflation, unless the governor declares an emergency . . . . The *general assembly shall by law define* 'increase in personal income', 'increase in inflation' and 'general budget expenditures' for the purposes of this section and may amend such definitions, from time to time, provided general budget expenditures shall not include expenditures for the payment of bonds, notes or other evidences of indebtedness. The enactment or amendment of such definitions shall require the vote of three-fifths

terms for article third, § 18 (b), which, as the attorney general in his brief for the defendants correctly notes, may never occur. Thus, under the majority's analysis, we would be forever powerless to hold the General Assembly to its constitutional responsibilities. I disagree.

The rights of the public to the implementation of article third, § 18 (b), cannot be frustrated by legislative nonfeasance any more than it can by legislative misfeasance. More than 100 years ago, this court recognized that, like misfeasance, nonfeasance may constitute a jurisdictional basis for this court. When confronted with a contested gubernatorial election case, the court held: "If, however, the General Assembly refuses to act, or if it be so that the General Assembly has jurisdiction of the election of a governor only in the manner and at the time pointed out by the constitution, then the relator is remediless unless the court may intervene. When the time is past within which the General Assembly may act its jurisdiction is gone. To hold that the Assembly has such exclusive jurisdiction, and that the court in no case can have the right to act, would be to afford an instance where a flagrant wrong was without a remedy." *State ex rel. Morris* v. *Bulkeley*, 61 Conn. 287, 374, 23 A. 186 (1892). The *Bulkeley* court concluded that if the legislature fails to act in accordance with its constitutional mandate, this court has jurisdiction to fill the void. Id., 376. More recently, with respect to legislation necessary to implement the constitutional probable cause procedure, this court said of legislative inaction: "[I]f both the General Assembly and the judges of the Superior Court failed to establish procedures [for probable cause hearings], thereby leaving the constitutional provision in limbo for an unreasonable period, this court could have imposed such procedures in order

of the members of each house of the general assembly. . . ." (Emphasis added.)

to effectuate the amendment. Because the legislature did act within a reasonable period, it was not necessary for us to do so." *State* v. *Sanabria*, 192 Conn. 671, 691–92 n.16, 474 A.2d 760 (1984). I agree with the *Sanabria* court, which included Chief Justice Peters, but I do not agree with the court's present analytical flip-flop.

We have a constitutional obligation to keep the doors of this court open in order to enforce our laws. The people of the state approved a constitutional amendment that would require both a balanced budget and a spending cap. We cannot excuse the legislature's default by merely labeling it a political question and thereby rendering the issue nonjusticiable. Nor is it appropriate for us to conclude that the only remedy available to the people is at the polling booth by "kicking the rascals out." Our democracy depends in part on the willingness of the courts to enforce uniformly our constitutional law. We cannot be selective and choose to enforce some provisions, while turning our backs on others. Indeed, as Chief Justice Peters wrote in dissent, "[w]hatever the reasons may be, legislative inaction does not, to my mind, relieve this court of its independent duty to vindicate the constitutional rights of those who appear before us." *Pellegrino* v. *O'Neill*, 193 Conn. 670, 695, 480 A.2d 476, cert. denied, 469 U.S. 875, 105 S. Ct. 236, 83 L. Ed. 2d 176 (1984).

I concur in the result, not because I believe that this is a political question, but because insufficient time has elapsed between the effective date of article third, § 18 (b), and this date. The doctrine of ripeness prudentially requires sufficient deference to the legislature in order to allow that separate and coordinate branch of government a reasonable time in which to act. "The best teaching of this Court's experience admonishes us not to entertain constitutional questions in advance of the strictest necessity." *Parker* v. *Los Angeles*, 338 U.S. 327, 333, 70 S. Ct. 161, 94 L. Ed. 144 (1949). This court

has implicitly recognized this doctrine by previously deferring to the legislature for a reasonable length of time. *State* v. *Sanabria*, supra, 192 Conn. 691–92 n.16. A little more than three years have elapsed since the effective date of article third, § 18 (b). This is simply an insufficient period for the issue to ripen, especially in view of the fact that a super-majority vote is required for the definitions to be adopted by the General Assembly.

By suggesting that we merely render a declaratory judgment, the plaintiffs themselves appear to have recognized that the legislature has not had a reasonable period in which to accomplish this task, which requires debate and compromise. I would decline the plaintiff's invitation, for the legislature does not need a declaratory judgement to define its responsibilities as it did in *Horton*. The legislature's responsibilities are already clearly stated in the language of article third, § 18 (b): "The general assembly shall by law define 'increase in personal income', 'increase in inflation' and 'general budget expenditures' for the purposes of this section and may amend such definitions, from time to time, provided general budget expenditures shall not include expenditures for the payment of bonds, notes or other evidences of indebtedness. The enactment or amendment of such definitions shall require the vote of three-fifths of the members of each house of the general assembly." If the legislature fails to perform its duty within a reasonable time period, the question will, in my view, ripen, and thereby allow us to define the terms, at least in the first instance, in order to implement article third, § 18 (b).

Although I disagree with the majority's reasoning, I concur in the result. The action should be dismissed on the ground that the issue is presently not ripe for adjudication.