## ROGER SHERMAN LIBERTY CENTER, INC., ET AL. *v.* DONALD E. WILLIAMS, JR., ET AL.

Superior Court, Judicial District of Hartford

File No. CV-11-6021502

Memorandum filed June 27, 2011

*Proceedings*

*Martha A. Dean*, for the plaintiffs.

*Jane R. Rosenberg, Mark F. Kohler* and *Gregory T. D'Auria*, assistant attorneys general, and *Peregrine Zinn-Rowthorn*, associate attorney general, for the defendants.

GRAHAM, J. The plaintiffs, Roger Sherman Liberty Center, Inc., Mark Greenberg, Leonard F. Suzio, Jr., Christopher D. Coutu and Dorothy Durst, initiated this action by verified complaint on May 9, 2011, and filed an amended complaint on May 17, 2011. They seek a writ of quo warranto, declaratory judgment and injunctive relief, asking the court to render null and void Public Acts 2011, No. 11-6 (P.A. 11-6), on the ground that it violates the constitution of Connecticut. The plaintiffs have named as defendants: Donald Williams, in his official capacity as the president pro tempore of the Senate; Christopher Donovan, in his official capacity as the speaker of the House of Representatives; Dannel Malloy, in his official capacity as the governor; and Benjamin Barnes, in his official capacity as the secretary of the office of policy and management.

The plaintiffs allege that the bill, titled "An Act Concerning the Budget for the Biennium Ending June 30, 2013," (budget bill) violates the constitution because it is unbalanced. The plaintiffs allege that the budget is in violation of article third, § 18 (a), of the constitution of Connecticut, which prohibits the General Assembly from authorizing general budgetary expenditures that

exceed anticipated revenues for the corresponding fiscal year. The plaintiffs allege that the budget bill authorizes budgetary expenditures that exceed anticipated revenues by approximately $2 billion over two years.

Currently before the court is the defendants' June 1, 2011 motion to dismiss the amended complaint on the ground that the court lacks subject matter jurisdiction over the plaintiffs' claims. The plaintiffs filed an objection to the motion on June 15, 2011. The defendants filed a reply memorandum on June 22, 2011. Oral argument was heard by the court on June 24, 2011, and, after a recess, the court announced its judgment of dismissal from the bench, with a brief summary of the reasons for that order. The court now details its reasoning in a written opinion.[1]

While the parties are at odds over what legal conclusions the court should draw from the facts, the relevant facts are not themselves in dispute. In their respective memoranda and at the hearing, all counsel relied upon the same facts. There was no testimony at the hearing and only one exhibit was offered.

The budget bill as initially enacted included estimated revenues for fiscal year 2012 of approximately $20.196 billion and net appropriations of approximately $20.14 billion. Not included in the net appropriations is more than $1 billion in unallocated lapses, various reductions and labor-management savings. The 2013 fiscal year budget is similar in approach although the exact numbers differ (approximately $20.92 billion estimated revenues, approximately $20.4 billion in net appropriations and, again, more than $1 billion in unallocated lapses, various reductions and labor-management savings).

---

[1] This opinion reflects only those facts presented to the court at the time of the hearing. It is those facts upon which the court necessarily based its ruling on June 24, 2011.

To achieve these reductions in budget expenditures for the biennium ending June 30, 2013, the legislature enacted certain provisions whereby further steps are required to reduce costs in personal services, other expenses and labor management savings after passage of the budget bill. Section 11 of the budget bill states in relevant part: "(a) The Secretary of the Office of Policy and Management shall recommend reductions in expenditures for Personal Services, for the fiscal years ending June 30, 2012, and June 30, 2013, in order to reduce such expenditures by $12,014,800 for such purpose during each such fiscal year. . . . (b) The Secretary of the Office of Policy and Management shall recommend reductions in expenditures for Other Expenses, for the fiscal years ending June 30, 2012, and June 30, 2013, in order to reduce such expenditures for such purpose by $9,440,200 during each such fiscal year. . . ." Section 12 states: "(a) Any agreement reached through negotiations between the state and the State Employees Bargaining Unit Coalition (SEBAC) concerning wages, hours and other conditions of employment to achieve the labor-management savings specified in this act shall be subject to approval of the General Assembly in accordance with section 5-278 of the general statutes. (b) (1) On or before May 31, 2011, the Governor shall submit the plan described in this subdivision in writing to the General Assembly. If an agreement described in subsection (a) of this section has been reached, such plan shall include (A) recommendations for legislation to apply terms comparable to those contained in such agreement to nonrepresented employees for the fiscal years ending June 30, 2012, and June 30, 2013, and (B) if such agreement achieves less than two billion dollars in savings over the biennium ending June 30, 2013, recommendations for budget adjustments to achieve the difference between that amount and two billion dollars. If no agreement

described in subsection (a) of this section has been reached, such plan shall include recommendations for budget adjustments not to exceed two billion dollars over the biennium ending June 30, 2013. (2) On or before June 8, 2011, the General Assembly shall enact legislation to (A) apply terms comparable to those contained in an agreement described in subsection (a) of this section and approved in accordance with section 5-278 of the general statutes to nonrepresented employees for the fiscal years ending June 30, 2012, and June 30, 2013, and (B) achieve budget adjustments not to exceed two billion dollars over the biennium ending June 30, 2013, to the extent such savings have not been achieved under any such agreement. (c) The Secretary of the Office of Policy and Management shall make reductions in expenditures not to exceed two billion dollars over the biennium ending June 30, 2013, (1) as provided in an agreement described in subsection (a) of this section and approved in accordance with section 5-278 of the general statutes for the fiscal years ending June 30, 2012, and June 30, 2013, and (2) contained in legislation enacted by the General Assembly under subdivision (2) of subsection (b) of this section."

Since the filing of the amended complaint, several developments have occurred, which are relevant to this action and which the parties have conceded on the record. On or about May 27, 2011, the governor and the officials for SEBAC signed a tentative agreement—subject to the ratification of the union members—that would achieve $1.6 billion savings over the course of the biennium. Then, on May 31, 2011, the governor submitted a plan to the legislature that included $1.6 billion in labor-management savings and allocated $400 million from an expected budget surplus. On June 6, 2011, the House of Representatives passed H.B. 6652, "An Act Implementing the Revenue Items in the Budget

and Making Budget Adjustments, Deficiency Appropriations, Certain Revisions to Bills of the Current Session and Miscellaneous Changes to the General Statutes," which, inter alia, implemented the governor's recommendations to balance the budget. On June 7, 2011, the Senate approved the same; it was subsequently signed by the Governor and it is now Public Acts 2011, No. 11-61 (P.A. 11-61). On June 8, 2011, the legislative session ended.

All thirty-four of the bargaining units comprising SEBAC were scheduled to vote on the labor agreement by June 24, 2011; at the time of the hearing the voting was incomplete and the outcome was neither known nor placed in the record. If the agreement was approved, the legislature would either be called into special session to approve the agreement or, after thirty days, the agreement would be deemed approved. If the agreement was rejected, the statute requires that the governor submit further recommendations to the legislature to achieve budget reductions. At the hearing, exhibit A was introduced, being the June 23, 2011 call by the governor for a special session on June 30, 2011. It states that ratification by SEBAC members "now appears to be in doubt" and seeks "prompt action by the General Assembly . . . ."

"A motion to dismiss . . . properly attacks the jurisdiction of the court, essentially asserting that the plaintiff cannot as a matter of law and fact state a cause of action that should be heard by the court." (Internal quotation marks omitted.) *C. R. Klewin Northeast, LLC* v. *State*, 299 Conn. 167, 174, 9 A.3d 326 (2010). "Subject matter jurisdiction involves the authority of the court to adjudicate the type of controversy presented by the action before it. . . . [A] court lacks discretion to consider the merits of a case over which it is without jurisdiction . . . . The objection of want of jurisdiction may be made at any time . . . [a]nd the court or

tribunal may act on its own motion, and should do so when the lack of jurisdiction is called to its attention. . . . The requirement of subject matter jurisdiction cannot be waived by any party and can be raised at any stage in the proceedings." (Internal quotation marks omitted.) *Burton* v. *Dominion Nuclear Connecticut, Inc.*, 300 Conn. 542, 550, 23 A.3d 1176 (2011).

In the present case, the defendants have raised issues of justiciability, which speak to the court's jurisdiction over the subject matter. "Because courts are established to resolve actual controversies, before a claimed controversy is entitled to a resolution on the merits it must be justiciable. . . . Justiciability requires (1) that there be an actual controversy between or among the parties to the dispute . . . (2) that the interests of the parties be adverse . . . (3) that the matter in controversy be capable of being adjudicated by judicial power . . . and (4) that the determination of the controversy will result in practical relief to the complainant. . . . As we have recognized, justiciability comprises several related doctrines, namely, standing, ripeness, mootness and the political question doctrine, that implicate a court's subject matter jurisdiction and its competency to adjudicate a particular matter." (Internal quotation marks omitted.) *Connecticut Coalition for Justice in Education Funding, Inc.* v. *Rell*, 295 Conn. 240, 254, 990 A.2d 206 (2010).

The defendants have moved to dismiss the plaintiffs' claims on the ground that they are not ripe. "Ripeness is a justiciability doctrine, which implicates the court's subject matter jurisdiction." *Bloom* v. *Miklovich*, 111 Conn. App. 323, 336, 958 A.2d 1283 (2008). "In light of the rationale of the ripeness requirement, to prevent courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements . . . [the court] must be satisfied that the case before [it] does not present a hypothetical injury or a claim

contingent upon some event that has not and indeed may never transpire." (Citation omitted; internal quotation marks omitted.) *Milford Power Co., LLC* v. *Alstom Power, Inc.*, 263 Conn. 616, 626, 822 A.2d 196 (2003).

The defendants argue that the plaintiffs' claims are not ripe because § 12 of the budget bill dictates a specific process for identifying the sources of $2 billion in savings and this process is incomplete. In response, the plaintiffs allege that the claim is ripe because the budget bill is unbalanced and was "authorized," as that term is used in article third, § 18 (a), of the Connecticut constitution, on May 4, 2011, the day it was signed into law by the governor.[2]

"The doctrine of ripeness prudentially requires sufficient deference to the legislature in order to allow that separate and coordinate branch of government a reasonable time in which to act. The best teaching of this Court's experience admonishes us not to entertain constitutional questions in advance of the strictest necessity. . . . This court has implicitly recognized this doctrine by previously deferring to the legislature for a reasonable length of time." (Citation omitted; internal quotation marks omitted.) *Nielsen* v. *State*, 236 Conn. 1, 16–17, 670 A.2d 1288 (1996) (*Berdon, J.*, concurring).

To avoid unnecessary interference in the functioning of a co-equal branch of government, courts avoid opining on constitutional issues prior to the development of a full factual record. "Determination of the scope and constitutionality of legislation in advance of its immediate adverse effect in the context of a concrete case involves too remote and abstract an inquiry for the proper exercise of the judicial function." (Internal quotation marks omitted.) *Lehrer* v. *Davis*, 214 Conn. 232, 235, 571 A.2d 691 (1990). "A party mounting a constitutional challenge to the validity of a statute must

[2] The complaint erroneously cites May 5, 2011.

provide an adequate factual record in order to meet its burden of demonstrating the statute's adverse impact on some protected interest of its own, in its own particular case, and not merely under some hypothetical set of facts as yet unproven." (Internal quotation marks omitted.) Id., 234–35.

Article third, § 18 (a), provides: "The amount of general budget expenditures authorized for any fiscal year shall not exceed the estimated amount of revenue for such fiscal year." The issue of ripeness turns upon whether the budget process is complete, so as present a controversy ready for adjudication, or is an ongoing and incomplete process, such that any attempt to evaluate its constitutionally would be premature and involve the court in a hypothetical dispute.

The court is persuaded that there is a budget process, not a single instantaneous act of budget creation, for this biennium. The text of the budget bill itself indicates that the budget process is ongoing, and cannot be complete, until further steps are taken. Since the plaintiffs brought this action, the state arrived at a tentative agreement with SEBAC, the governor submitted revised budget numbers to the legislature, and the passage of P.A. 11-61 adjusted the budget to reflect those revisions. At the time of this hearing, the tentative agreement between the state and SEBAC was being voted upon, the final results were unknown, and the legislature has provided in P.A. 11-61 for it to either approve a ratified SEBAC agreement or receive new budget recommendations from the governor if the SEBAC agreement is not ratified. The governor has called for a special session before the next fiscal year because ratification of that tentative agreement is in doubt. It is clear to the court that the budget bill of May 4, 2011, is not a final rendition of the General Assembly's budget for the biennium ending June 30, 2013, but merely an important step in a budgeting process that has yet to conclude. By way of

analogy, the budget for the upcoming biennium is not a snapshot taken on May 4 but a movie begun that day which has yet to film its final scenes.

In conclusion, the plaintiffs' claims are unripe because they present a claim contingent upon future events that have not, and may never, occur. The outcome of the union ratification was uncertain as of the hearing on this motion to dismiss and the steps that will or will not be taken by the governor and legislature to deal with any rejection of the SEBAC tentative agreement are unknown. The final shape of the budget is unclear. Accordingly, this court lacks subject matter jurisdiction over the plaintiffs' claims because they are not ripe for adjudication.

The defendants also move to dismiss the complaint on the ground that the plaintiffs' claims involve a political question, which deprives the court of subject matter jurisdiction. The plaintiffs counter that it is within the jurisdiction of this court to rule upon whether the budget bill is unconstitutional.

The political question theory does not preclude this court from ruling upon every matter which may have political implications. In this courthouse last year, eight election related cases were adjudicated, on issues ranging from eligibility for office to campaign financing to election recounts.

"The political question doctrine . . . is based on the principle of separation of powers . . . as well as the notion that the judiciary should not involve itself in matters that have been committed to the executive and legislative branches of government. To conclude that an issue is within the political question doctrine is not an abdication of judicial responsibility; rather, it is a recognition that the tools with which a court can work, the data which it can fairly appraise, the conclusions which it can reach as a basis for entering judgments,

have limits. . . . Whether a controversy so directly implicates the primary authority of the legislative or executive branch, such that a court is not the proper forum for its resolution, is a determination that must be made on a case-by-case inquiry. . . .

"Following *Baker* v. *Carr*, [369 U.S. 186, 82 S. Ct. 691, 7 L. Ed. 2d 663 (1962)] [i]n considering whether a particular subject matter presents a nonjusticiable political question, we have articulated [six] relevant factors, including: a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question. Unless one of these formulations is inextricable from the case at bar, there should be no dismissal for nonjusticiability on the ground of a political question's presence. . . . Furthermore, simply because the case has a connection to the political sphere [is not] an independent basis for characterizing an issue as a political question . . . . Indeed, the principle that a case should not be dismissed for nonjusticiability as a political question unless an unusual need for unquestioned adherence to that decision is inextricable from the case, means that courts should view such cases with a heavy thumb on the side of justiciability, and with the recognition that, simply because the case is connected to the political sphere, it does not necessarily follow that it

is a political question." (Citations omitted; internal quotation marks omitted.) *Connecticut Coalition for Justice in Education Funding, Inc.* v. *Rell,* supra, 295 Conn. 255–56.

The balanced budget requirement in our state constitution is set forth at article third, § 18 (a), and states: "The amount of general budget expenditures authorized for any fiscal year shall not exceed the estimated amount of revenue for such fiscal year." Conn. Const., art. III, § 18 (a). Adopted at the same time, and as part of the same XXVIII amendment to the constitution of Connecticut was part § 18 (b), known as the spending cap subsection, which states: "The general assembly shall not authorize an increase in general budget expenditures for any fiscal year above the amount of general budget expenditures authorized for the previous fiscal year by a percentage which exceeds the greater of the percentage increase in personal income or the percentage increase in inflation, unless the governor declares an emergency or the existence of extraordinary circumstances and at least three-fifths of the members of each house of the general assembly vote to exceed such limit for the purposes of such emergency or extraordinary circumstances. The general assembly shall by law define 'increase in personal income', 'increase in inflation' and 'general budget expenditures' for the purposes of this section and may amend such definitions, from time to time, provided general budget expenditures shall not include expenditures for the payment of bonds, notes or other evidences of indebtedness. The enactment or amendment of such definitions shall require the vote of three-fifths of the members of each house of the general assembly." Conn. Const., art. III, § 18 (b).

At the heart of the dispute between the parties as to whether P.A. 11-6 meets the balanced budget requirement of article third, § 18 (a), is the question of how

to define "general budget expenditures." The plaintiffs wish to define it to exclude the lapses and similar devices[3] which have been a common feature of adopted budgets for many years. P.A. 11-6 is exceptional not in the use of such lapses and similar devices but only in the dollar amount attributed to them. To define "general budget expenditures" to exclude such lapses and similar devices would result in a much larger total for "general budget expenditures" than the total of the estimated revenues. The defendants insist that lapses and similar devices are acceptable budget tools and may legitimately be included in "general budget expenditures" to reduce the total expenditures below the estimated total revenues. In short, the plaintiffs wish to use a gross expenditure number as the "general budget expenditures" while the defendants insist that a net expenditure number constitutes the "general budget expenditures." Without resolving this crucial issue, no court could determine if the "general budget expenditures" of this budget did or did not exceed the estimated annual revenues.

The case law in Connecticut is clear that a court may not resolve this particular issue. The first factor in the application of the political question doctrine to a case is whether the issue is committed by constitutional text to another branch of state government. In *Nielsen* v. *State*, supra, 236 Conn. 9, the Supreme Court ruled that article third, § 18, contains a " 'textually demonstrable constitutional commitment' " of the definition of several terms in that section to the legislature. Among those terms is the key phrase here "general budget expenditures."[4]

---

[3] Public Act 11-6 utilizes unallocated lapses, general personal services and general other expenses, reductions and labor-management savings.

[4] Although "general budget expenditures" is defined for statutory purposes at General Statutes § 2-33a, the legislature never approved the definition by a three-fifths majority. Accordingly, the definition is inapplicable for constitutional purposes. *Nielsen* v. *State*, supra, 236 Conn. 13 n.8.

As stated in *Nielsen*: "Central to our determination that the plaintiffs' claim presents a nonjusticiable political question is the textually demonstrable constitutional commitment of the definition of the[se] . . . terms to the General Assembly. . . . Article third, § 18 (b), provides in relevant part: The *general assembly shall by law define* increase in personal income, increase in inflation and general budget expenditures for the purposes of this section . . . . This provision, by its plain and unambiguous terms, commits exclusively to the General Assembly the power to define the[se] . . . terms and nowhere intimates any role in this process for the judiciary. Moreover, neither the structure nor the history of the provision manifests any intended constraint on the unconditional definitional authority conferred upon the General Assembly. . . . Nothing elsewhere in our constitution contradicts this textual commitment to the General Assembly. . . .

"Accordingly, because article third, § 18, clearly commits to the General Assembly the sole authority to define the[se] . . . terms, we have no jurisdiction to consider the merits of the plaintiffs' claim. We must resist the temptation which this case affords to enhance our own constitutional authority by trespassing upon an area clearly reserved as the prerogative of a coordinate branch of government." (Citations omitted; emphasis in original; internal quotation marks omitted.) Id., 9–10.

*Nielsen* also provides clear guidance that the second factor in the political question doctrine exists here. As in *Nielsen*, there is a lack of manageable and discoverable standards to determine if this constitutional provision has been violated.

"[W]e decline . . . to supply the definitions that the General Assembly has failed to enact and give immediate operative effect to article third, § 18. We decline to

do so for two reasons. First, we can discern no principled guidelines for the definitions contemplated by article third, § 18. Second, we are persuaded that our intervention would directly contravene the amendment as it was adopted.

"The terms for which article third, § 18, requires definitions have no inherent meanings that are reliably discernable through judicial processes. The decision of what is to be encompassed within . . . general budgetary expenditures requires the exercise of political judgment rather than the application of judicial scrutiny. Nothing in our constitutional law provides reliable guidance for judicial discernment of the appropriate legal definitions or standards to attach to these . . . terms. The lack of judicially discoverable and manageable standards for resolving the claim before the court is a hallmark of nonjusticiability." (Internal quotation marks omitted.) Id., 12.

The motion to dismiss is granted because the plaintiffs' claims are not ripe for adjudication and present a nonjusticiable political question, each of which deprives the court of subject matter jurisdiction.