[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
Memorandum Filed July 21, 1997
The plaintiff, the City of Bridgeport (Bridgeport), commenced this action against the named defendants, hereinafter referred to as "Stratford."[1] Subsequently, Nicholas Mainero and Joseph J. Garamella, hereinafter referred to as the "intervening defendants", were added as party defendants. Stratford and the intervening defendants will be referred to collectively as the defendants".
 I A
The Amended complaint dated August 1, 1996, is the operative complaint. The amended complaint sets forth three counts, seeking a declaratory judgment, a writ of mandamus, and, a temporary restraining order, respectively. Summarized, the amended complaint alleges that Bridgeport is the owner and operator of the Igor I. Sikorsky Memorial Airport (Sikorsky Airport), which is located entirely within the territorial limits of the Town of Stratford; Amended Complaint, Counts 1-3, ¶¶ 13 and 14; that Stratford has failed to comply with General Statutes § 15-91, which allegedly requires Stratford to adopt, administer and enforce airport zoning regulations that govern the use of property surrounding Sikorsky Airport;[2] id., ¶¶ 19-20,23-26, 30-31, 33, and 36-37; that Stratford has failed to comply with General Statutes § 8-2, which allegedly requires Stratford to recognize Sikorsky Airport in the Town of Stratford's comprehensive plan of zoning;[3] id., ¶¶ 15,30-31, 34-35, 39; and, that Stratford's failure to perform the aforementioned statutory duties has caused Bridgeport harm, and also subjects Bridgeport and the general public to the risk of future harm. Id., ¶ 38.
In the first count of the amended complaint, Bridgeport seeks a judgment declaring: (1) that Stratford has failed to adopt, administer and enforce the airport zoning regulations required by General Statutes § 15-91; (2) that Stratford is required, pursuant to § 15-91, to adopt airport zoning regulations that CT Page 7326 protect the land and airspace approaches to Sikorsky Airport, including the "runway protection zone", the "object free area", and "safety areas"; and, (3) that Stratford has failed to incorporate Sikorsky Airport fully into the Town of Stratford's comprehensive plan as required by General Statutes § 8-2. Bridgeport further requests costs and attorneys' fees.
In the second count, Bridgeport seeks a writ of mandamus compelling Stratford: (1) to adopt, without conditions, the airport zoning regulations required by § 15-91; and, (2) to revise the Town of Stratford's § 8-2 comprehensive plan so that it fully recognizes Sikorsky Airport. Moreover, Bridgeport requests such other and further relief as in equity or law may appertain, costs and attorneys' fees.
In the third count, Bridgeport seeks a temporary restraining order prohibiting Stratford from: (1) approving any zoning applications for property located within the "Runway Protection Zone of the airport safety area, or, the object free area as defined by Part 152 of the Code of Federal Regulations; and (2) issuing any building permits for property within the same areas.
By its answer dated August 2, 1996, Stratford denies that it has failed to comply with §§ 15-91 and 8-2. Stratford further sets forth three special defenses. The first special defense asserts that the court lacks subject matter jurisdiction because the action involves a nonjusticiable political question. The second special defense asserts that the court lacks subject matter jurisdiction because Bridgeport's claims are nonjusticiable under the mootness doctrine. The third special defense asserts that Bridgeport is not entitled to the equitable relief requested because it lacks clean hands. Stratford alleges that Bridgeport lacks clean hands because Stratford has demonstrated its willingness to adopt airport zoning regulations, as allegedly required by § 15-91, provided Bridgeport agrees to recognize its obligation, as alleged by Stratford, to pay just compensation for any property taken directly or indirectly as a result of the airport zoning regulations.
The first and second special defenses reclaim for the court's consideration the defendants' motion to dismiss, which was raised for the first time by oral motion on July 31, 1996, the morning trial was scheduled to begin. As discussed infra, Section I (B), on May 8, 1997, the court denied the defendants' motion to dismiss, concluding that it could not decide the issues raised CT Page 7327 until after the court heard the evidence at trial.
 B
The noteworthy procedural history is as follows. On February 2, 1989, upon the presentation of Bridgeport's verified complaint, the court, Thompson, J., issued an ex parte temporary restraining order that stated:
 It is Hereby Ordered that the Building Department of the Town of Stratford be directed not to issue building permits to National Properties, Inc. and/or Joseph J. Garamella and/or other entities for property [located within] the Airport Impact Zone (Exhibits "A" and "B") of the Igor I. Sikorsky Memorial Airport and that the Planning and Zoning Commission and Zoning Board be directed not to approve or certify any applications which will permit any building in the Airport Impact Zone (Exhibits "A" and "B") of the Igor I. Sikorsky Memorial Airport pending a hearing before this court. . . .
Temporary Restraining Order, #102.[4] To date the temporary restraining order remains in effect.
On August 1, 1995, the intervening defendants were added as party defendants. The intervening defendants claimed an interest in the action because, among other things, the February 2, 1989, temporary restraining order affected real property owned by them.
The case was tried to the court from July 31 to August 2, 1996. On July 31, 1996, when evidence was scheduled to begin, the defendants appeared before the court and orally moved to dismiss the action on the ground that it was nonjusticiable because the action was moot, and/or, it involved a political question. After hearing the parties' arguments and considering the equities involved, the court decided to postpone a decision on the oral motion until after the conclusion of the courtside trial.
On August 2, 1996, at the conclusion of the trial, the defendants filed a written motion to dismiss as directed by the court. The court then entertained further argument on the motion to dismiss. After argument on the motion to dismiss, the court entertained argument on Bridgeport's request to amend the CT Page 7328 complaint. The court granted Bridgeport's request to amend its complaint, and also permitted Stratford to amend its answer in response. The court, however, denied both Bridgeport and Stratford's request to add a new theory of liability — breach of contract — to the action. The court denied the request to add a new theory to the case because the evidentiary stage of the proceeding had ended, and the case was not tried upon a breach of contract theory.[5]
By motion dated August 2, 1996, the intervening defendants moved the court to dissolve the temporary restraining order. The intervening defendants answered the amended complaint by pleading dated February 3, 1997.
As mentioned previously, on May 8, 1997, the court denied the defendants' motion to dismiss. In its memorandum of decision, the court noted that, as a matter of law, it should have addressed the defendants' motion to dismiss before proceeding to trial and before entertaining and acting upon the requests to amend the pleadings. To correct the procedural flaw, the court reviewed the motion to dismiss as it related to the verified complaint. The court denied the motion to dismiss the verified complaint, concluding that a full evidentiary hearing would be required to decide whether the action was moot, or, whether it involved a political question. The court stated that it would revisit sua sponte the defendants' grounds for dismissal after it made its findings of fact and conclusions of law.[6]
 II
The first count of the amended complaint seeks a declaratory judgment. "A declaratory judgment action is a special proceeding under General Statutes § 52-29 that is implemented by §§ 389 and 390 of the Practice Book." Rhodes v. Hartford,201 Conn. 89, 92, 513 A.2d 124 (1986). "The purpose of a declaratory judgment action, . . ., is to `secure an adjudication of rights where there is a substantial uncertainty of legal relations between the parties.'" Bombero v. Planning Zoning Commission,40 Conn. App. 75, 78, 669 A.2d 598 (1996). Practice Book § 390 provides: "The court will not render declaratory judgments upon the complaint of any person: (a) unless the party has an interest, legal or equitable, by reason of danger of loss or of uncertainty as to the party's rights or other jural relations; or (b) unless there is an actual bona fide and substantial question or issue in dispute or substantial uncertainty of legal relations CT Page 7329 which requires settlement between the parties; or (c) where the court shall be of the opinion that the parties should be left to seek redress by some other form of procedure; or (d) until all persons having an interest in the subject matter of the complaint are parties to the action or have reasonable notice thereof." Practice Book § 390. "`The provision [of Practice Book § 390] that there must be an issue in dispute or an uncertainty of legal relations which requires settlement between the parties means no more than that there must appear a sufficient practical need for the determination of the matter.'" Bombero v. Planning Zoning Commission, supra, 79.
The second count seeks a writ of mandamus. "`It is well established that mandamus will issue only if the plaintiff can establish: (1) that the plaintiff has a clear legal right to the performance of a duty by the defendant; (2) that the defendant has no discretion with respect to the performance of that duty; and, (3) that the plaintiff has no adequate remedy at law.'" Townof Stratford v. State Board of Mediation Arbitration,239 Conn. 32, 44, 681 A.2d 281 (1996); accord Schuchmann v. City ofMilford, 44 Conn. App. 351, 358, 689 A.2d 513, cert. denied,240 Conn. 924, (1997).
III — Section 15-91 Claim
Based upon the evidence, the court finds and concludes the following as to Bridgeport's claim that Stratford has failed to adopt, administer and enforce airport zoning regulations required by General Statutes § 15-91.
 A
Sikorsky Airport is located within the territorial limits of the Town of Stratford. Since the 1920's, the airport has been located in the south end of the Town of Stratford on approximately 800 acres of land bounded roughly by Lordship Boulevard, Access Road, and Main Street. Defendants' Exhibit 2, p. 81. As it exists today, Sikorsky Airport has two operational runways, Runway 11-29 and Runway 6-24. See Plaintiff's Exhibit B, p. 2 of 7 (map of airport matted upon cardboard). Runways are named in accord with the numerical numbers assigned to each end of the runway. See Plaintiff's Exhibit B, p. 4 of 7 (additional map matted upon cardboard).
Bridgeport, a municipality, is the owner and operator of CT Page 7330 Sikorsky Airport. Sikorsky Airport, therefore, is a "publicly-owned" airport as that term is used in General Statutes §§ 15-88 to 15-97, inclusive. See General Statutes § 15-88
(c).
By enacting §§ 15-88 to 15-97, inclusive, the legislature established a comprehensive statutory scheme for the identification and regulation of "airport hazards." An airport hazard is statutorily defined as "any structure or tree which obstructs or may hereafter obstruct the aerial approaches of a publicly-owned airport." General Statutes § 15-88 (b).[7]
The legislature declared "that an airport hazard endangers the lives and property of users of the airport and of occupants of land in its vicinity; and, if of the obstruction type, in effect reduces the size of the area available for the safe landing, taking-off and maneuvering of aircraft, thus destroying or tending to destroy or impair the utility of the airport and the public investment therein, and is therefore not in the interest of public health, public safety or general welfare." General Statutes § 15-89. Based upon this declaration and the findings therein, the legislature directed Connecticut's Commissioner of Transportation (commissioner) to formulate and adopt an airport approach plan for publicly-owned airports. General Statutes § 15-90. Section 15-90 provides:
 The commissioner is directed to formulate and adopt, and from time to time as may be necessary revise, an airport approach plan for each publicly-owned airport in the state. Each such plan shall indicate the circumstances in which structures or trees or both are or would be airport hazards, the area within which measures for the protection of the airport's aerial approaches should be taken and what the height limits and other objectives of such measures should be. In adopting or revising any such plan, the commissioner shall consider, among other things, the character of the flying operations expected to be conducted at the airport, the nature of the terrain, the height of existing structures and trees above the level of the airport, the practicability of lowering or removing existing obstructions and all other material matters, and the commissioner may obtain and consider the views of the agency of the federal government charged with the fostering of civil aeronautics as to the aerial approaches necessary to CT Page 7331 safe flying operations at the airport.
See also General Statutes § 15-34 (14) ("`Commissioner' means the Commissioner of Transportation of this state."). Hence, as Sikorsky Airport is a publicly-owned airport, the commissioner has been directed by the legislature to formulate and adopt an airport approach plan for Sikorsky Airport that complies with the specifications of § 15-90. General Statutes § 15-90.
Once a § 15-90 airport approach plan has been adopted by the commissioner, § 15-91 (a) states that "[e]very municipality having within its territorial limits an area within which, according to an airport approach plan adopted by the commissioner, measures should be taken for the protection of airport approaches, shall adopt, administer and enforce, under the police power and in the manner and upon the conditions hereinafter prescribed, airport zoning regulations applicable to such area, which regulations shall divide the area into zones and, within such zones, specify the land uses permitted, and regulate and restrict the height to which structures and trees may be erected or allowed to grow, as may be necessary to effectuate the commissioner's approach plan for the airport." General Statutes § 15-91 (a). Since the § 15-91 airport zoning regulations are to effectuate the commissioner's §15-90 airport approach plan, any statutory duty that is arguably imposed upon a municipality under §§ 15-91 and 15-94 can arise only after a § 15-90 airport approach plan has been adopted by the commissioner.
 B
This statutory background and the preliminary findings brings the court to the first issue raised by this action: Has the commissioner adopted a § 15-90 airport approach plan for Sikorsky Airport? The court notes that the term "airport approach plan" has been used loosely throughout this trial. But there is no mistake that a plan must meet certain specifics before it qualifies as a § 15-90 airport approach plan. For instance, an airport approach plan under § 15-90 "shall indicate the circumstances in which structures or trees or both are or would be airport hazards, the area within which measures for the protection of the airport's aerial approaches should be taken and what the height limits and other objectives of such measures should be." General Statutes § 15-90. Thus, the court recognizes that § 15-90 imposes certain requirements of a CT Page 7332 plan before it qualifies as a § 15-90 approach plan.
With this in mind, the court finds, based upon the evidence, that at least by July 31, 1996, the commissioner adopted a §15-90 airport approach plan for Sikorsky Airport. Although Bridgeport's allegations and contentions necessarily imply that a § 15-90 airport approach plan for Sikorsky Airport was adopted by the commissioner long before July 31, 1996, the evidence at trial failed to provide the exact date the commissioner adopted the § 15-90 approach plan. Thus, based solely upon the evidence, the court finds that by July 31, 1996, a § 15-90 airport approach plan was adopted by the commissioner for Sikorsky Airport. As this finding is critical to the case, the court further explains.
Kenneth Robert, the Aviation Administrator for the State of Connecticut Department of Transportation's Bureau of Aviation and Ports,[8] testified before the court on July 31, 1996. Robert reports to the chief of the Bureau of Aviation and Ports, who reports to the Commissioner of Transportation. Robert testified that as Aviation Administrator he is responsible for all aviation operations within the State of Connecticut and acts as a liaison between the federal government and municipalities. Robert testified that in order to obtain certain federal grant money, Bridgeport is required by the Federal Aviation Administration to maintain on file at Sikorsky Airport an airport "master plan." Robert explained that a master plan is a collection of drawings depicting a twenty year study of an airport, designed to illustrate a plan of development for the airport. Robert conceded that many of the master plan drawings for Sikorsky Airport depict the future development of Sikorsky Airport as envisioned by Bridgeport and the Connecticut Department of Transportation. Nonetheless, Robert testified that certain drawings depict Sikorsky Airport as it presently exists.
Robert testified on cross examination by Stratford that the commissioner adopted the airport approach plans contained within the Sikorsky Airport Master Plans as the § 15-90 airport approach plan. See Trial Transcript pp. 124-25. The Sikorsky Airport Master Plans are in evidence.[9] Robert testified that he personally approved the 1993 Master Plan while acting as the interim chief of the Bureau of Aviation and Ports, during a transition period between the administrations of Governor Weicker and Governor Rowland. Id., p. 44. Robert's testimony was both credible and unrebutted. The court therefore accepts the CT Page 7333 testimony as true.
From this uncontested testimonial evidence, and a review of the 1983 and 1993 Master Plans, the court finds that an airport approach plan that complied with the specifics of § 15-90 was adopted by the commissioner sometime after May 1995. The exact date, however, is uncertain. Nonetheless, the court is able to find that a § 15-90 approach plan was adopted by July 31, 1996, the date Robert testified. The reasons are as follows. First and foremost, Robert testified that the commissioner adopted the airport approach plan, even though he did not provide an exact date of adoption. Thus, there is testimony on July 31, 1996, from Robert, a credible source, that a § 15-90 approach plan has been adopted. Second, it is common knowledge that Governor Rowland won the November 1994 election, and was sworn into office in January 1995. Thus, the transition period to which Robert testified occurred after November 1994. It follows, therefore, that Robert's approval of the 1993 Master Plan occurred after November 1994, a finding supported by the Master Plan itself, as the 1993 Master Plan contains a map dated May 1995, and Robert clearly could not have approved a plan that had yet to be completed. It likewise follows that the commissioner did not adopt the approach plan until on or after May 1995, because common sense dictates that the commissioner would not adopt a § 15-90 airport approach plan from a Master Plan that was not yet completed, nor approved by Robert as the interim bureau chief for the Bureau of Aviation and Ports.
Finally, the court finds that the airport approach plans contained within the 1983 and 1993 Master Plans did not comply with § 15-90 until the completion of a map contained within the 1993 Master Plan dated May 1994. Section 15-90 states that "[e]ach such [approach] plan shall indicate the circumstances in which structures or trees or both are or would be airport hazards, the area within which measures for the protection of the airport's aerial approaches should be taken and what the height limits and other objectives of such measures should be." General Statutes § 15-90. Even though the aerial approaches to Sikorsky Airport were identified in the 1983 Master Plan; see Plaintiff's Exhibit B, 1983 Master Plan, p. 6-9; it was not until the approach plan in the 1993 Master Plan, which was dated May 1994, that an approach plan identified existing airport hazards and indicated measures that should be taken to protect the aerial approaches. See Plaintiff's Exhibit B, 1993 Master Plan, p. 5 of 7. CT Page 7334
Therefore, the only evidence of an approach plan that complies with § 15-90 is a map dated May 1994 in the 1993 Master Plan. The 1993 Master Plan was not approved until sometime after May 1995, because a map within the 1993 Master Plan is dated May 1995. There is no evidence of the exact date that the commissioner adopted the 1993 Master Plan approach plan as the § 15-90 approach plan. On July 31, 1996, however, Robert appeared in court and testified that the commissioner did adopt the § 15-90 approach plan. This testimony was credible and remained unrebutted. Therefore, although the court cannot state the exact date the commissioner adopted the § 15-90 airport approach plan for Sikorsky Airport, the court is able to find based upon the evidence that as of July 31, 1996, such an approach plan existed, as presented to the court as Plaintiff's Exhibit B, 1993 Master Plan, p. 5 of 7, and, Exhibit B, 1983 Master Plan, pp. 6-9.
As explained by Robert; Trial Transcript p. 114-18; and depicted in the § 15-90 approach plans; Plaintiff's Exhibit B, 1983 Master Plan, pp. 6-9; id., 1993 Master Plan, p. 5 of 7; the aerial approaches to the landing and takeoff surfaces at Sikorsky Airport are illustrated by imaginary lines that start near the end of the runways and rise into the air at a predetermined glide ratio. The glide ratio represents the airspace needed to safely takeoff or land on the particular runway surface, taking into consideration several factors, such as prevailing wind conditions and air traffic control instruments. Robert testified that to protect the aerial approaches, no objects should be permitted to penetrate above the imaginary line. Some of the land located below the imaginary approach line is within the territorial limits of the Town of Stratford. Thus, the adopted § 15-90 approach plan; Plaintiff's Exhibit B, 1983 Master Plan, p. 6-9 and 1993 Master Plan, p. 5 of 7; identifies areas within the territorial limits of the Town of Stratford where measures should be taken to protect Sikorsky Airport's aerial approaches. The § 15-90
airport approach plan further identifies airport hazards that presently endanger the aerial approaches to Sikorsky Airport that are within the territorial limits of the Town of Stratford. Seeid.
 C
The next question is: Does § 15-91 (a) require Stratford CT Page 7335 to adopt, administer and enforce airport zoning regulations? General Statutes § 15-91 (a) provides:
 Adoption of airport zoning regulations. (a) Every municipality having within its territorial limits an area within which, according to an airport approach plan adopted by the commissioner, measures should be taken for the protection of airport approaches, shall adopt, administer and enforce, under the police power and in the manner and upon the conditions hereinafter prescribed, airport zoning regulations applicable to such area, which regulations shall divide the area into zones and, within such zones, specify the land uses permitted, and regulate and restrict the height to which structures and trees may be erected or allowed to grow, as may be necessary to effectuate the commissioner's approach plan for the airport.
(Emphasis added.) General Statutes § 15-91 (a). As found by the court, supra, Section II (A) and (B), the Town of Stratford is a "municipality having within its territorial limits an area within which, according to an airport approach plan adopted by the commissioner, measures should be taken for the protection of airport approaches." Hence, all that remains is the determination of whether the statute imposes a mandatory duty on Stratford.
"`As is true in every case involving the construction of a statute, [the] starting point must be the language employed by the legislature.'" Keeney v. Fairfield Resources, Inc.,41 Conn. App. 120, 131, 674 A.2d 1349 (1996). "It is a principle of statutory construction that a court must construe a statute as written"; Leo Fedus Sons Construction Co. v. Zoning Board ofAppeals, 225 Conn. 432, 441, 623 A.2d 1007 (1993); the fundamental objective of which "is to ascertain and give effect to the apparent intent of the legislature." Stein v. Hillebrand,240 Conn. 35, 40, 688 A.2d 1317 (1997); Crest Pontiac Cadillac,Inc. v. Hadley, 239 Conn. 437, 445, 685 A.2d 670 (1996). "In interpreting the language of a statute, the words must be given their plain and ordinary meaning and their natural and usual sense unless the context indicates that a different meaning was intended. . . . When the language is plain and unambiguous, we need look no further than the words themselves because we assume that the language expresses the legislature's intent. . . . Indeed, `[a] basic tenet of statutory construction is that when a CT Page 7336 statute . . . is clear and unambiguous, there is no room for construction.'" (Citations omitted) Oller v. Oller-Chiang,230 Conn. 828, 848, 646 A.2d 822 (1994).
It has been noted by our appellate court that the word "shall" has an accepted statutory meaning. New Haven v. Local 884 ofCouncil No. 4, AFSCME, AFL-CIO, 38 Conn. App. 709, 712,662 A.2d 818 (1995), rev'd on other grounds, 237 Conn. 378, 677 A.2d 1338
(1996). "`As used in statutes, contracts, or the like, this word is generally imperative or mandatory. . . . It has the invariable significance of excluding the idea of discretion, and has the significance of operating to impose a duty which may be enforced, particularly if public policy is in favor of this meaning . . . .'Black's Law Dictionary (6th Ed. 1990)." Id.; see also American Heritage Dictionary (1981) (noting that when used in statutes, deeds, and other legal documents, the word "shall" connotes compulsion, with the force of must).
Nonetheless, the legislature's use of the term "shall" in a statute, does not, ipso facto, lead to the conclusion that the statute creates a mandatory duty. See, e.g., New Haven v. Local884, Council 4, AFSCME, AFL-CIO, supra, 237 Conn. 384 n. 6. Instead, our Supreme Court has stated: "`Well established principles of statutory construction govern our determination of whether a statute's provisions are mandatory or directory. . . .
"While we generally will not look for interpretive guidance beyond the language of the statute when the words of the statute are plain and unambiguous . . . our past decisions have indicated that the use of the word `shall,' though significant, does not invariably create a mandatory duty. . . . In order to determine whether a statute's provisions are mandatory we have traditionally looked beyond the use of the word `shall' and examined the statute's essential purpose. . . . `The test to be applied in determining whether a statute is mandatory or directory is whether the prescribed mode of action is the essence of the thing to be accomplished, or in other words, whether it relates to a matter of substance or a matter of convenience. . . . If it is a matter of substance, the statutory provision is mandatory. If, however, the legislative provision is designed to secure order, system and dispatch in the proceedings, it is generally held to be directory . . . .'" (Citations omitted; internal quotation marks omitted.) Crest PontiacCadillac, Inc. v. Hadley, supra, 239 Conn. 445-46; accord Katz v.Commissioner of Revenue Services, 234 Conn. 614, 617, CT Page 7337662 A.2d 762 (1995).
In the court's view § 15-91(a) concerns a matter of substance, and therefore, its provisions are mandatory. In §15-89, the legislature "declared that an airport hazard endangers the lives and property of users of the airport and of occupants of land in its vicinity; and, if of the obstruction type, in effect reduces the size of the area available for the safe landing, taking-off and maneuvering of aircraft, thus destroying or tending to destroy or impair the utility of the airport and the public investment therein, and is therefore not in the interest of public health, public safety or general welfare." General Statutes § 15-89. The legislature has thus found that airport hazards jeopardize the public within and without the municipality where the airport is located. Cf. Colt v. Eves,12 Conn. 243, 253 (1837) (the public within and without the city may need the benefit of the city court). This court cannot imagine a matter of greater substance for the legislature to address than the regulation of a subject matter within the oversight of the legislature that the legislature has found to jeopardize, among other things, the lives of the general public.
That the legislature intended to impose a mandatory duty is further supported by the language the legislature used throughout the statutory scheme. The legislature expressly sets forth in what manner and upon what conditions the airport zoning regulations are to be adopted. See General Statutes § 15-91
(a) (airport zoning regulations shall be adopted, administered and enforced "in the manner and upon the conditions hereinafter prescribed. . . ."). Further, the legislature uses the words "may" and "shall" within the same statute. Cf. Builders ServiceCorp. v. Planning Zoning Commission, 208 Conn. 267, 304,545 A.2d 530 (1988); Seals v. Hickey, 186 Conn. 337, 345,441 A.2d 604 (1982). Subsection (b) provides that a municipality "may" incorporate airport zoning regulations into the general zoning regulations; General Statutes § 15-91 (b); and subsection (d) provides that the commissioner "may" adopt airport zoning regulations to protect the public if the municipality has not complied with subsection (a). General Statutes § 15-91 (d). The legislature's selective use of "may" and "shall" within the same statute, § 15-91, indicates an intent to distinguish between a directory and mandatory connotation. Builders ServiceCorp. v. Planning Zoning Commission, supra; Seals v. Hickey,supra.
CT Page 7338
Lastly, further support for the conclusion that § 15-91
imposes a mandatory duty is found in the comprehensive nature of the statutory scheme. The statutory scheme affords protection to existing airport hazards as nonconforming uses; General Statutes § 15-91 (d); and establishes that general zoning regulations shall not limit the effectiveness or scope of airport zoning regulations adopted under § 15-91 (a). General Statutes §15-91 (b). It would be inconsistent with the statutory scheme and the legislative intent as gleaned from the statutory language to conclude that the legislature intended to leave the decision whether to adopt, administer and enforce airport zoning regulations to the discretion of a municipality, which is influenced by local pressures, after the legislature has gone to great lengths to create such a comprehensive statutory scheme, which involves an unbiased, independent, state actor, the commissioner.
Therefore, for these reasons, the court concludes that the legislature intended to impose a statutory duty upon municipalities to adopt airport zoning regulations in accordance with § 15-91. This interpretation is consistent with, and, advances, the interests of public policy. New Haven v. Local 884of Council No. 4, AFSCME, AFL-CIO, supra, 38 Conn. App. 712.
 D
The third issue: Under § 15-91, what are the airport zoning regulations required to regulate? Section 15-91 (a) provides that the airport zoning regulations "shall divide the area into zones and, within such zones, specify the land usespermitted, and regulate and restrict the height to whichstructures and trees may be erected or allowed to grow, as may benecessary to effectuate the commissioner's approach plan for theairport." (Emphasis added.) General Statutes § 15-91 (a). The purpose of a § 15-90 approach plan is to identify at what height a structure or tree would become an airport hazard. General Statutes § 15-90. An airport hazard is "any structure or tree which obstructs or may hereafter obstruct the aerial approaches of a publicly-owned airport." General Statutes §15-88 (b).
Therefore, under the statutory scheme, Stratford retains the discretion to determine what uses it will permit within the newly created zones. General Statutes § 15-91 (a). The height of any use, however, is necessarily constrained by the runway's CT Page 7339 approach glide ratio, as identified in the commissioner's approach plan. Id. The contention suggested by Bridgeport that the airport zoning regulations are required to protect certain land in ground zones surrounding the airport, as opposed to the aerial approaches to the airport, is rejected. Section 15-91
requires the protection of the aerial approach zones to an airport's runways.
 E
At this juncture, the court will discuss Stratford's special defense that Bridgeport is not entitled to any of the relief requested based on the doctrine of unclean hands. Stratford argues that General Statutes §§ 15-73 and 13b-43, as interpreted by our Supreme Court in Powers v. Ulichny,185 Conn. 145, 150, 440 A.2d 885 (1981), demonstrate that it is Bridgeport's responsibility to compensate property owners for any property rights acquired in order to protect the airport. Stratford claims that it is willing to adopt the required airport zoning regulations if Bridgeport would accept its responsibility and sign an agreement to pay for any property taken, either directly or indirectly, as a result of the airport zoning regulations. Stratford argues that Bridgeport's refusal to sign the hold harmless agreement constitutes unclean hands.
Bridgeport argues that Stratford is required to adopt the airport zoning regulations regardless of whether Bridgeport enters into a hold harmless agreement. Bridgeport therefore argues that its failure to enter into such an agreement cannot constitute unclean hands.
The court believes that Stratford is willing to adopt the required airport zoning regulations if Bridgeport would sign the hold harmless agreement. Nevertheless, the court agrees with Bridgeport and rejects Stratford's special defense of unclean hands. Section 15-91 states that the zoning regulations shall be adopted "under the police power and in the manner and upon the conditions hereinafter prescribed . . . ." General Statutes §15-91. There is nothing in the statutory scheme that suggests that the adoption of airport zoning regulations may be conditioned upon the public owner of the airport signing a hold harmless agreement. Stratford's obligation springs from the adoption of an airport approach plan by the commissioner, an unbiased, independent actor. Bridgeport's failure to agree to a hold harmless clause, therefore, does not constitute unclean CT Page 7340 hands.
Moreover, another purpose of airport zoning regulations is to protect the public investment in the airport. General Statutes § 15-89. Protecting the public investment could be accomplished by reducing the amount of money Bridgeport has to expend in order to protect the airport from an encroaching community. The reasonable restriction of private property rights through the constitutional exercise of the police power may obviate the need for Bridgeport to acquire property rights to protect the airport. Indeed, if airport zoning regulations were adopted prior to the Powers v. Ulichny case, query whether the result might have been different. See Powers v. Ulichny, supra,185 Conn. 148 (the court expressly noted "that there are no airport zoning ordinances involved in this case. . . . Therefore the plaintiffs cannot invoke §§ 15-88 through 15-97 to support their action for an injunction").
This court notes, however, that Stratford's taking concern is not unwarranted. See, e.g., 18 A.L.R.4th 542, and cases cited therein. Nonetheless, the focus of this case was whether Stratford is required by § 15-91 to adopt airport zoning regulations, not whether the airport zoning regulations result in a constitutional taking that requires compensation. A takings claim is fact specific; see D'Addario v. Planning ZoningCommission, 25 Conn. App. 137, 148, 593 A.2d 511 (1991) (a taking claim should be determined on a case-by-case basis); and this case lacks the facts, not to mention the complaining party, necessary to determine whether a compensable taking would result. Indeed, a takings claim may never arise, as the property owner may be adequately protected in the administrative process. Gil v.Inland Wetlands Watercourses Agency, 219 Conn. 404, 415,593 A.2d 1368 (1991) (a plaintiff "is not entitled to judicial review of the merits of his regulatory takings claim until he has met the requirement of establishing the finality of the agency determination."); see also General Statutes § 15-91 (d) (all airport zoning regulations must be reasonable); DeForest Hotchkiss Co. v. Planning Zoning Commission, 152 Conn. 262,269, 205 A.2d 774 (1964) (it would be difficult to conceive that a zoning authority would not grant a property owner relief upon proof that the zoning regulations, as it effects the owner's property, are so arbitrary and unreasonable as to be confiscatory); Corthouts v. Newington, 140 Conn. 284, 289-90,99 A.2d 112 (1953) (where the court declared invalid a zoning amendment that was unreasonable); General Statutes §§ 15-94
CT Page 7341 and 15-95 (property owners' right to appeal airport zoning regulation decisions). Moreover, if a compensable taking occurs, who would be responsible to pay compensation is another issue to be decided. See, e.g., Ackerman v. Port of Seattle, 55 Wash.2d 400,348 P.2d 664, 671-72 (1960); Griggs v. Allegheny County,369 U.S. 84, 89, 82 S.Ct. 531, 7 L.Ed.2d 585 (1962); 77 A.L.R.2d 1344, § 2(c). Hence, Stratford's attempt to use a phantom property owner to justify its fear of an inverse condemnation claim cannot work to excuse its failure to adopt airport zoning regulations as required by our legislature under § 15-91. Whether the required airport zoning regulations result in a constitutional taking; whether the taking results in damage that requires just compensation; and, who is the party responsible, in a constitutional sense, to pay the just compensation — these are all questions that should be answered when the facts are ripe for judicial review. Bauer v. Waste Management ofConnecticut. Inc., 234 Conn. 221, 230, 662 A.2d 1179 (1995) (ordinarily constitutional issues are not considered unless absolutely necessary to the decision of a case).
 F
Stratford also reclaims the defendants' motion to dismiss on the ground that the action is nonjusticiable. "In the absence of a justiciable controversy, the courts have no [subject matter] jurisdiction." Kleinman v. Marshall, 192 Conn. 479, 484,472 A.2d 772 (1984). "The principles that underlie justiciability are well established. `Justiciability requires (1) that there be an actual controversy between or among the parties to the dispute . . . (2) that the interests of the parties be adverse . . . (3) that the matter in controversy be capable of being adjudicated by judicial power . . . and (4) that the determination of the controversy will result in practical relief to the complainant.' (Citations omitted.) State v. Nardini, 187 Conn. 109, 111-12, 445 A.2d 304
(1982); Pellegrino v. O'Neill, 193 Conn. 670, 674, 480 A.2d 476, cert. denied, 469 U.S. 875, 105 S.Ct. 236, 83 L.Ed.2d 176
(1984)." Nielsen v. State, 236 Conn. 1, 6-7, 670 A.2d 1288
(1996).
The defendants contend that the action is nonjusticiable because it is moot, and/or, it involves a political question that cannot be adjudicated without violating the constitutional principle of separation of powers. The mootness and political question doctrines implicate the justiciability of an action, and thus, the court's jurisdiction. The mootness doctrine is a hybrid CT Page 7342 of the first and fourth requirements of justiciability. SeeDomestic Violence Services of Greater New Haven v. FOIC,240 Conn. 1, 7, 688 A.2d 314 (1997) (the mootness doctrine ensures that an actual controversy exists); Grace Community Church v.Bethel, 30 Conn. App. 765, 769, 622 A.2d 591 (courts will not decide moot questions, the determination of which no practical relief can follow), cert. denied 226 Conn. 903, 625 A.2d 1375, cert. denied 510 U.S. 944, 114 S.Ct. 383, 126 L.Ed.2d 332 (1993). The political question doctrine is equated with the third requirement. See Nielsen v. State, supra, 236 Conn. 7 ("The third requirement for justiciability, the political question doctrine, is based on the principle of separation of powers."). The defendants' contentions under each doctrine will be addressed separately.
1
"A case becomes moot when due to intervening circumstances a controversy between the parties no longer exists.'" (Internal quotation mark omitted.) Domestic Violence Services of GreaterNew Haven v. FOIC, supra, 240 Conn. 7. A case is moot when the court can no longer grant any of the relief requested. Koennickev. Maiorano, 43 Conn. App. 1, 32 n. 26, 682 A.2d 1046 (1996).
The defendants argue that the action is moot because the relief requested has already been accomplished. As to Bridgeport's claim under § 15-91, the defendants contend that the amended complaint ultimately seeks the adoption of airport zoning regulations. The defendants argue that an ordinance adopted by the Stratford Town Council established the airport zoning regulations required by § 15-91 (a). The defendants therefore argue that the § 15-91 claim is moot.
Upon review of the ordinance adopted by the Stratford Town Council; Defendants Exhibit 3; the court concludes that it fails to comply with the requirements of § 15-91. Facially, the substantive provisions of the ordinance appear to regulate the areas designated for protection by the airport approach plan; however, the ordinance states that the areas "shall not be regulated under these Airport Zoning Regulations unless enforcement action is expressly approved by the Stratford Town Council, and an agreement is made by the City of Bridgeport or any subsequent owner of Sikorsky Memorial Airport to pay for any claims for direct or inverse condemnation damages to those properties affected by enforcement of these Regulations, as well CT Page 7343 as to reimburse the Town of Stratford for any costs, fees, expenses or claims arising out of such enforcement." Id., p. 5, Sec. 6(A). Section 15-91 (a) states that the airport zoning regulations shall be adopted "in the manner and upon the conditions hereinafter prescribed . . . ." General Statutes § 15-91 (a). There is nothing in §§ 15-88 through 15-97
that authorizes the conditions imposed by Stratford upon the enforcement of the airport zoning regulations. The ordinance therefore does not comply with § 15-91, and the action is therefore not moot.
2
Stratford further claims that the action should be dismissed as nonjusticiable because it involves a political question. Stratford argues, citing to General Statutes § 15-94, that the state legislature granted to the Town of Stratford's legislative body exclusive discretion to adopt airport zoning regulations. Stratford further argues, citing § 15-91 (e), that the legislature granted the commissioner, not the courts, the exclusive power to review any adopted airport regulations. Stratford therefore argues that the courts cannot order the adoption of airport zoning regulations, or, review the ordinance adopted by the Stratford Town Council, without violating the constitutional principle of separation of powers. Hence, Stratford argues that the action should be dismissed as nonjusticiable.
"`The characterization of [an issue] as political is a convenient shorthand for declaring that some other branch of government has constitutional authority over the subject matter superior to that of the courts.' Pellegrino v. O'Neill, [193 Conn. 670, 680, 480 A.2d 476, cert. denied, 469 U.S. 875,105 S.Ct. 236, 83 L.Ed.2d 176 (1984)] `The fundamental characteristic of a political question, therefore, is that its adjudication would place the court in conflict with a coequal branch of government in violation of the primary authority of that coordinate branch. Baker v. Carr, [369 U.S. 186, 217,82 S.Ct. 691, 7 L.Ed.2d 663 (1962)].' Nielsen v. Kezer, [232 Conn. 65, 74,652 A.2d 1013 (1995)].
"`Whether a controversy so directly implicates the primary authority of the legislative or executive branch, such that a court is not the proper forum for its resolution, is a determination that must be made on a case-by-case inquiry.' Id., CT Page 7344 74-75. `Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question. Unless one of these formulations is inextricable from the case at bar, there should be no dismissal for nonjusticiability on the ground of a political question's presence.' Baker v. Carr, supra,369 U.S. 217; see Fonfara v. Reapportionment Commission, 222 Conn. 166,184-85, 610 A.2d 153 (1992)." Nielsen v. State, supra,236 Conn. 7-8.
This court is unable to detect in this case that which our Supreme Court stated would be prominent on the surface of any case involving a political question. See Nielsen v. State, supra,236 Conn. 6-8. The determination of the issues — whether § 15-91 imposes a mandatory duty upon Stratford to adopt, administer and enforce airport zoning regulations; what should the regulations regulate; is Stratford complying with the law as interpreted — these are all issues that are judicial in nature and constitutionally committed to the judicial branch. The airport approach plan adopted by the commissioner for Sikorsky Airport provides judicially discoverable and manageable standards for resolving this dispute. The legislature has already decided the policy that airport zoning regulations must be adopted, administered and enforced for the protection of lives and property of users of the airport, and for the protection of the public investment in the airport. General Statutes § 15-89. Further, the Connecticut Department of Transportation has adopted a § 15-90 airport approach plan establishing the measures that should be taken; the court is not creating the measures. The court's consideration of this case does not express a lack of due respect to a coordinate branch of government; on the contrary, the failure to consider this case would express an individual determination by this court that § 15-91 is unworthy of enforcement. Judges should not embark on an individual determination of which laws are and which laws are not worthy of enforcement. Finally, the defendants have failed to show how the CT Page 7345 consideration of this case will breach a political decision already made. On the contrary, the court's consideration of this case observes the defined roles of the three branches of our government. In the end, Stratford is correct that this case involves a political question. That question, whether municipalities should adopt, administer and enforce airport zoning regulations to protect the aerial approaches of publicly-owned airports, has already been answered by our legislature when it enacted General Statutes § 15-88, et seq. This court is merely considering a dispute under our laws.
The court therefore concludes that the case should not be dismissed as a political question.
IV — Section 8-2 Claim
Bridgeport also claims that Stratford has failed to comply with General Statutes § 8-2, which allegedly requires Stratford to recognize Sikorsky Airport in the Town of Stratford's comprehensive plan. In the second count, Bridgeport seeks a judgment declaring that Stratford has failed to incorporate Sikorsky Airport fully into the Town of Stratford's comprehensive zoning plan as required by General Statutes §8-2, and a writ of mandamus compelling Stratford to revise the Town of Stratford's comprehensive zoning plan, thereby including Sikorsky Airport fully within the comprehensive plan. The court refuses to reach the merits of Bridgeport's claim because it is of the opinion that Bridgeport has an adequate remedy under § 19 of the Town of Stratford Zoning Regulations; see Defendant's Exhibit 1; and Bridgeport should seek redress in accordance with that remedy. See Practice Book § 390(c).
In support of its claim that § 8-2 requires Stratford to recognize Sikorsky Airport in its comprehensive plan, Bridgeport relies upon a provision within § 8-2 which states: "Such regulations shall be made in accordance with a comprehensive plan and in adopting such regulations the commission shall consider the plan of development prepared under section 8-23." (Emphasis added.) There is a notable distinction between a § 8-2
comprehensive plan and a § 8-23 plan of development. A §8-23 plan of development is merely advisory so far as zoning is concerned, whereas zoning authorities are required to follow the § 8-2 comprehensive plan when adopting or amending zoning regulations. First Hartford Realty Corp. v. Plan ZoningCommission, 165 Conn. 533, 542, 338 A.2d 490 (1973). CT Page 7346
"In the absence of a formally adopted comprehensive plan, a town's comprehensive plan is to be found in the scheme of the zoning regulations themselves." (Internal quotation marks omitted.) Protect Hamden/North Haven from Excessive Traffic Pollution, Inc. v. Planning Zoning Commission, 220 Conn. 527,551, 600 A.2d 757 (1991). There is no evidence before the court which indicates whether the Town of Stratford has formally adopted a § 8-2 comprehensive plan. Defendant's exhibit 2 is the § 8-23 plan of development. Thus, the Town of Stratford's comprehensive plan is to be found in the scheme of the town's zoning regulations themselves.
As a preexisting, nonconforming use, Sikorsky Airport is clearly not recognized in the current Town of Stratford's zoning regulations, and thus, not in its comprehensive plan. Indeed, the zoning regulations fail to recognize an airport as a permitted or special use in any zoning district. Further, uses that are permitted as a matter of right upon property in the vicinity of Sikorsky Airport are incompatible with and hazardous to the safe operation of an airport.
Even though Sikorsky Airport is a nonconforming use, and the elimination of a nonconforming use is a goal of zoning; seePetruzzi v. Zoning Board of Appeals, 176 Conn. 479, 484,408 A.2d 243 (1979); Molic v. Zoning Board of Appeals, 18 Conn. App. 159,164, 556 A.2d 1049 (1989); see also Woodford v. ZoningCommission, 147 Conn. 30, 33, 156 A.2d 470 (1959) (if property is not rezoned, the elimination of a nonconforming use might ultimately be achieved); the improbability of eliminating Sikorsky Airport — a large, nonconforming use, with peculiar characteristics — considered along with the growth of the community around this unique nonconforming use, may present a situation where it would be unreasonable for a zoning authority to refuse to recognize the nonconformity formally in its comprehensive plan. Indeed, "[t]he zoning authority, acting as a legislative body, may amend or modify zoning ordinances or regulations when the growth and progress of the town require it, or where it is for the general welfare of the community. . . . By necessity a comprehensive zoning plan must undergo changes. `If any zoning plan is to be really comprehensive, it must be kept up to date. . . . A plan may . . . become quite obsolete where there is a refusal to recognize changing conditions in a community.' . . . Zoning regulations cannot remain static or immutable; changing conditions require orderly changes. . . . The CT Page 7347 zoning commission is under a duty reasonably to anticipate future conditions which could affect the public welfare." (Citations omitted.) Pierrepont v. Zoning Commission, 154 Conn. 463, 469,226 A.2d 659 (1967).
Since the Town of Stratford's comprehensive plan is found in its zoning regulations themselves, Bridgeport's prayer for relief would require the court to order Stratford to amend its zoning regulations or to create a new zoning district. This court is of the opinion that the zoning authorities of the Town of Stratford should first entertain the question whether it should amend its zoning regulations or add a new zoning district. If Bridgeport files such a petition with the town's zoning authorities and the petition is denied, Bridgeport can appeal that denial. The court therefore denies the relief requested under the § 8-2 claim without prejudice to Bridgeport raising the claim directly to the proper zoning authority.
V — Motion to Dissolve the Temporary Injunction
The motion to dissolve the temporary injunction is granted because there is a final determination on the merits and the relief provided no longer necessitates maintaining the status quo.
VI — Relief
As to the relief requested in the first count in relation to Bridgeport's claim under § 15-91, the court declares:
(1) That the legislative body of the Town of Stratford is required by §§ 15-91 and 15-94, to adopt forthwith, administer and enforce, without condition, airport zoning regulations that restrict the height of trees and structures, as those terms are defined by § 15-88 (d) and (e), so that the trees and structures shall not penetrate the aerial approach surface, which is determined in accordance with the glide ratio, as illustrated in the § 15-90 airport approach plan for Sikorsky Airport; and,
(2) That Stratford has failed to comply with its statutory duties imposed by § 15-91.
As to the relief requested in the second count in relation to Bridgeport's claim under § 15-91, the court hereby issues a CT Page 7348 writ a mandamus compelling the legislative body of the Town of Stratford to adopt forthwith, administer and enforce airport zoning regulations consistent with this opinion and in accordance with § 15-91, as it is required to do by § 15-94. Moreover, in the exercise of its equitable powers, the court further enjoins the Town of Stratford and its agents from considering any zoning applications, or, from issuing any building permits, with regard to property that is both: (1) beneath the aerial approaches to the runways; and (2) within the Runway Protection Zone or the Object Free Area, until the legislative body of the Town of Stratford adopts, without condition, the airport zoning regulations in accordance with § 15-91, as required by § 15-94 and the order of this court.
MORAN, J.